May it please this Honorable Court, Counsel, Members of the Gallery, my name is Brian Brislin. I'm here today to represent the interests of Petitioner Appellant, Aspro, Inc. Jurisdiction is proper and uncontested in this Court. Appeal was timely filed from the decision of the Tax Court below. The standard of review today, Your Honors, is clearly erroneous with regard to almost all of the issues with the exception of the issue of whether appellant's expert should have been excluded in material part with opinions that he intended to offer. And that standard is abuse of discretion. So with that, real quickly, I think it's important to understand some of the facts of this case. Aspro, Inc. is a small business located in Waterloo, Iowa, engaged in the business of laying asphalt roads primarily in the Waterloo area, Cedar Falls area. It's a stationary plant. It means it takes its hot tar that must maintain a temperature and can only operate within a certain radius. It does not have portable stations as some other competitors do. Aspro depends heavily on the local business for that reason. One of the main issues in this case is the provision of services by shareholders and affiliated companies of those shareholders. One of those activities that were provided is what's known as the alternate bid process. The alternate bid process is when the City of Waterloo would let out a contract that can be fulfilled either by an asphalt paver or a concrete paver. Aspro does not do concrete work. However, that bid will receive bids on concrete work for concrete companies to come in and lay concrete down on streets and roads or asphalt companies. Counsel, I don't think there was any real dispute that there could be connections between these various businesses and sharing of services and provision of services to the others. It seems the tax court was heavily influenced by the absence of evidence indicating that of what was exchanged. Yes, Your Honor, agreed. That's why this is so important because you're absolutely right. There is no dispute, there was no evidence that the services that were actually provided were in fact provided. There's no question about that. What the tax court below focused on was the compensatory intent, as she put in her opinion, of the petitioner. In other words, she found that there was no intention of the petitioner to compensate for those services. In fact, that this was a way to disguise dividends. Now, why that part is important is because there's not a case to be cited that we've found and that the Commissioner has cited that would indicate that that ends the inquiry. For all intents and purposes, that ended the inquiry at the tax court. So all of the case law that is available out there analyzes the portion of which payments were made would be compensatory and the portion which was not compensatory. What was the evidence produced in the record to demonstrate the value of the services? Well, the evidence in the court below, and this is one of the mystifying pieces of this, the Commissioner's own expert went through an analysis of whether That's the Nunez report? Correct, Your Honor. The Nunez report goes through an analysis. The Nunez report concludes that approximately $77,000 was compensatory and the value of the services that were actually rendered. So faced with that, that's the floor, the tax court still finds it's zero. And it does so apparently because it finds a lack of compensatory intent and then it goes on to analyze the reasonableness and the customary and usual nature of the services provided and goes on to find that the services that were in fact provided, there's no dispute about that, were not usual and customary for the industry. Now, that's why going back to what is the nature of this company? ASPRO is a small business. ASPRO is a, for lack of a better term, landlocked company that can only work in a certain area. What's the gross revenue for ASPRO in a given year? It's in the low 20s, between $20 and $24, $25 million a year. And that's fairly consistent with, incidentally, almost a third to 40% of that every year, every year at issue here, being contingent upon that alternate bid process that I talked about earlier. So when the court looks at this and says, well, this alternate bid process, whereby ASPRO Incorporated's president will go to Jackson Enterprises, one of its shareholders, who is a concrete company, but does not work in this general vicinity, goes to them and says, help me understand where concrete bids may come in on this, the court apparently takes a view that that's not customary and usual, and therefore it's not compensable. So in order to make that conclusion, the court has to say either that service wasn't given, which it didn't do, it acknowledges the service was given, and then it just has to go to this, well, it wasn't customary and reasonable. That's not the standard that this circuit employs. This circuit employs a more realistic standard to say what actually happened here. What actually happened here is you look at where the company is, who it is, what it is, and determine what amount of the service provided was reasonably considered compensation. And what's your best case for that being our standard? I think there's a couple, Your Honor. It's the Watson v. U.S. case, that's 668 Fed 3rd, 1008. And the Coomer v. Commissioner case, 511 Fed 2nd, 313. And those cases don't announce the rule the way we're saying it, but that is the effect of the rule. And with regard to... Doesn't your client, though, have the burden of proving that it's compensation? And here, aren't all of the indicia making it appear as if these are dividends? There are no regular dividends. There's no contracts, no agreements, no invoices. The distribution is proportional, and it's near the end of the year, every year. I mean, aren't all of the indicia leaning toward these being dividends? Your Honor, the issue of whether they're dividends or not, a couple things. Number one is the case law is clear, and the tax commissioner, the commissioner recognizes. Dividends are not required to be paid. The fact that they were not paid at the years in issue is a factor, certainly, and that should be looked at. But if they're not paid, they're retained earnings, right? If they exist, then they would be retained earnings by the company, yes. And that gets into whether you go through the factor analysis test or you look at the independent investor test and things of that nature. Now, interestingly, to get back to your question about the burden, Judge Pugh in the tax court excluded our expert witness who had an opinion about the reasonableness of the payments. And that is, again... What was that opinion based on? What was going to be the underlying evidentiary basis for the expert's opinion? It was based on his, as I recall, the training and experience he had, and then he cited, I think, two source materials, much like Nunes did, in certainly a far briefer format. Nunes' report was quite large. But he had citations to two source materials. Those are listed in our reply brief, I know, Your Honor. I can't recall the names of those reports. But they're essentially compilations of industry reports for what things cost. You know, the other interesting part of this is, and this, again, dovetails back to your question, Judge Gruender, is some of the services that the tax court found were not ordinary and customary were things like human resources. It's undisputed that the Jackson family of companies provided substantial human resources, help and assistance, facilitating the health plan that the company, that ASPRO was able to have at no cost other than the management. Did the record put a value on those services? Well, again. Did the evidence in the record put a value on those human resource services? Yeah. Again, Mr. Nunes certainly did. There's no question that Mr. Nunes did. Your expert did not, though, right? He wasn't allowed to. He was not allowed to testify on those issues. But it wasn't part of his report either? Not specifically, no. How much were they valued at? In the Nunes report? Well, what was before the tax court in terms of what it had to do with some of the issues? I recall that the investment services provided by Tim Manat were at $5,000. The Mona Bond environmental services, and there was one other that came after the report because Nunes appeared in trial and listened to everything and amended his report up to the $77,000. So what I would say, Your Honor, is it's somewhere between $5,000 and probably $50,000 that made up the HR value. But the court didn't, in its order, provide any analysis of why it found that there was a lack of information as to the value. That wasn't the holding of this court. The court said the value doesn't matter. The service wasn't reasonable and ordinary. Would it be possible on the record that's on appeal to give some value to those services based on the existing figures and in the case with providing some remuneration for the services rendered? As far as the district? Must this be remanded to address what value there might be in services actually rendered? I think from the standpoint of what this court can do, I don't think that based on what the order was in the record before this court that the court could say, we are reversing this opinion in this way and finding that the value was X, Y, or Z. I think it should be remanded back to the court to say, the standard here isn't just that you find there was a lack of compensatory intent and then disregard the rest. The standard is you have to determine what amount was actually provided as reasonable compensation for a service actually provided. That's what the treasury rate says. But are the facts going to be any different? Is there going to be different evidence before the tax court? Well, I think the one piece of evidence that would certainly be different would be the expert report. The expert was not allowed to testify at all on these issues. So at that point, we couldn't go to the expert and say, all right, you've seen Nunez's report. You've heard the testimony. What's your opinion? She found that he shouldn't be able to testify as to those items. So I believe, Your Honor, that the answer is tied to the fact that she excluded the expert witness and I believe was an abuse of her discretion to do so. Unless there's further questions at the instant moment, I'd like to reserve the remainder of my time for rebuttal. Thank you, Mr. Breslin. Thank you. Mr. Brandman, please, the court. Robert Brandman for the Commissioner of Internal Revenue. I think the, from what I've heard so far, the court understands our case pretty well. I don't intend to take very much time. Let me jump right to it then. Mr. Brandman, why? I think it's undisputed that these entities provided some service. Yes. Why aren't they entitled to some credit, some compensatory deductible credit? Well, ASPRO never connected the services provided from, you know, persons at operating companies, other operating companies, with its shareholders that it paid the money to. And when you sort of look at the numbers, it's obvious to see that there couldn't be a connection. ASPRO paid its shareholders about $1.5 million each year. When the evidence came in that the services were valued at about $77,000, it's obvious that there is no connection between the two. The 1.5 Why wouldn't they get $77,000 deductible? Well, when a service is provided by someone over there, there's no reason for the company to pay a management fee to an unrelated person. In this case, those unrelated, the payments were all made to shareholders. But weren't some of the shareholders the employers of the individuals that provided the services? There were some connections between them, but But isn't that clear in the record? Excuse me. Who's a shareholder of what company? Who the checks were made out to? I mean, to say that they're unrelated seems a bit of a stretch when we just conceded that there are some relationships between them. So what specifically was missing below? Some agreement between the shareholders that received the payment and the individuals or persons who provided the service. There was no, you know, sort of specific invoicing for what happened when. There was no, you know, payment for each service as they were provided. The payments to shareholders were sort of a holistic payment based on what ASPRO's revenues were. Nothing was documented at the time. It was only, you know, years later when the IRS started looking at the transaction. What level of specificity of documentation is required by law? There's no, I don't think there's anything specific about that. There just has to be something. The tax court saw what there was here. It said this looks like a last minute scramble to find everyone associated with the shareholders who did any, maybe even distantly related to the ASPRO and trying to make it look good in retrospect. What about the payment to the president who was an actual employee? Oh, well, the payment to the president, that was connected, yes. I mean, the president had his salary and bonuses and director's fees and he also got these management fee payments. For that, the tax court didn't have to figure out a relationship. It just had to figure out, well, how much was reasonable. And based on the expert testimony, the president was already overcompensated by some $200,000 a year just based on his salary and bonus compared to industry peers. So the tax court concluded that the additional management fees were not reasonable and therefore could not be deducted by the corporation as salary or compensation. Let me answer a little bit better one of your questions for my friend about what was in Kennedy's report as in terms of numbers. He did cite some kind of industry report that- That's ASPRO's expert. That ASPRO's expert, yes. He did cite some sort of industry report just as to the president's salary, Mr. Dakovich. He didn't provide any numbers or provide any kind of evidence about those other services, which our expert valued at $77,000 based on reading the depositions, listening to the testimony, figuring out what kind of work they did and how many hours they spent and what was a fair price for those hours. That's how our guy came to $77,000. Kennedy didn't provide any sorts of details for those services. He just sort of pulled a number out of the air. I think it's 60 to 70% of the 1.5 million, but no explanation as to how he got there. I pointed out that an additional defect in his number that proved how useless it was is that he also said a significant portion of that 60 to 70% was for Mr. Bonat's work 10 years before on a referendum, but the Internal Revenue Code does not allow a deduction for compensation paid to someone for influencing a public referendum. That could not be allowed under any circumstance. What was the tax court to do with Mr. Kennedy's report that said, I think these services were worth 60 to 70% of 1.5 million and a significant portion of that is for something that couldn't be allowed at all? There would be nothing for the tax court to do with that. Even allowing that report in would not help on remand, would not help the tax court figure out a value for those services other than the President's salary. What is astonishing to me about my friend's argument is that it begins with the premise that it's not necessary to show compensatory intent to take a deduction under Section 162A where the requirement is right in the statute allowing a deduction for compensation for personal services actually rendered and is also in the Treasury regulation requiring that the test for deductibility in the case of compensation is whether they are reasonable and are in fact payments purely for services. The argument that the petitioner doesn't have to show compensatory intent for personal services as part of his case essentially is throwing out the statute altogether and saying any deduction, as long as it's reasonable for anything, is allowed. I think I've covered my points and if there are no questions, I'll stand down. Thank you. All right, Mr. Breslau. Thank you, Your Honors. In my last couple of minutes, a couple of things. In our opening brief on pages 44 through 46, we have a table that delineates each of Mr. Nunez's opinions as to value. Let me ask you, your $77,000 figure comes from the government's expert. Correct. If the burden is on you, can you rely on the government's expert? I believe so, Your Honor. It's admitted testimony in the trial and it's also an admission by the government as to what the government's own expert believed. Now, we certainly believe it's higher than $77,000 for many good reasons that we delineated in the court, the biggest of which, perhaps, from a line item standpoint, would be the alternate bid process. That's one-third to 40% of this company's revenue. If they don't get that bid every year, that company is a shell of itself. Any company that would take a 33% hit to its revenues in any year is going to be in trouble. A couple of mentions on Mr. Dokovich's payment. Mr. Dokovich's payment by Mr. Nunez's own admission, his time to find a replacement Mr. Dokovich, which I'll tell you there is none. But if the company was able to do that, they'd have to pay $200 an hour, Mr. Nunez said. Mr. Dokovich works basically 365 days a year, but consider it 261 days a year. His compensation is perfectly in line with what it is, and that also dovetails with what Mr. Kennedy would have said had he been allowed. The last comment I'll make, Your Honors, is the concept of, to clear up some of my stance, it is not that compensatory intent is irrelevant. The statute allows compensation that is reasonable for services actually provided. There's no question services were actually provided. There's no question that those services were reasonable. The question is what are they worth, and the Court clearly erred in finding the answer to that question to be zero. This case should be remanded and instructions given to the Court to follow the standard of this circuit. Thank you, Mr. Breslin. Thank you very much, Your Honors. The Court thanks both counsel.